# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1358-19T3

C.A.K.,

    Plaintiff-Respondent,

v.

B.K.,

    Defendant-Appellant.

_____

          Submitted November 10, 2020 – Decided December 18, 2020

          Before Judges Yannotti and Natali.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-0568-20.

          Daniel O. Sloan, attorney for appellant.

          Respondent has not filed a brief.

PER CURIAM

Defendant appeals from a final restraining order (FRO) entered by the Family Part on November 13, 2019, pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.[1] We affirm.

I.

We briefly summarize the pertinent facts. On September 30, 2019, plaintiff filed a complaint under the PDVA alleging that defendant committed acts of domestic violence on September 16, 2019, by demeaning her character, calling her a "whore," berating her in a harassing manner, and threatening to "ruin" her life. She also claimed defendant sent text messages to six of her family members in an annoying manner. Plaintiff noted that she had a consent order with civil restraints previously issued in Essex County. The trial court entered a temporary restraining order (TRO) and scheduled the matter for a plenary hearing.

At the hearing, plaintiff testified that she and defendant married in February 2010. During the marriage, the parties had one child, a son, who was born in February 2013 and was residing with plaintiff. The parties separated in September 2018 and were in the process of divorcing.

---

[1] We use initials to identify the parties and others to protect the identity of plaintiff. See R. 1:38-3(c)(12).

A-1358-19T3

Plaintiff stated that on September 16, 2019, at around 6:00 p.m., she and defendant were attending their son's baseball practice, and they were on opposite sides of the field. Plaintiff went to her car to get her son's water bottle, and defendant approached her with a bill for her cellphone, which was on a service plan with defendant's phone. She told defendant she would discuss the bill "at a later time." Defendant asked plaintiff if she would pay the bill. She again said they would discuss it later.

According to plaintiff, defendant shoved his phone in her face, which apparently was displaying a message from defendant to S.M., who was the girlfriend of an individual whom plaintiff had dated in the past. Plaintiff could not read the message because defendant showed her the phone too quickly. She stated that defendant continued to argue with her and said he would "fuck up her life." She said that during the argument defendant called her a "whore" and a "cum dumpster."

Plaintiff also stated that the argument continued, and she eventually got into her car, shut the door, and asked defendant to leave. While in the car, plaintiff called defendant's mother to explain what was happening. She remained in her car until defendant left the area. The following day, plaintiff's

mother informed her that defendant sent a text message to members of plaintiff's family. She said her mother forwarded defendant's message to her.

Plaintiff further testified that previously, she sought and had been granted TROs against defendant. She explained that the first TRO arose out of an incident that occurred in September 2018, when defendant came to plaintiff's home to visit their son. According to plaintiff, defendant was highly intoxicated at the time, and they argued over a laptop computer.

During the argument, plaintiff and defendant both had their hands on the computer, and they were pushing and pulling. Plaintiff said defendant grabbed plaintiff's arm tightly, which caused bruising. He also "smashed" the laptop. Plaintiff presented the judge with photos showing the "condition" defendant was in at the time of the argument, the damaged laptop, and the bruises on her arm.

Plaintiff stated that the second TRO arose out of an incident that took place in May 2019. She said defendant sent her a text message at 11:21 p.m. Her friend was visiting her at the time. She stated that defendant's text message included a picture showing her friend's car parked outside her apartment. In the text message, defendant stated that he was going to cancel her support and that her friend should "pay for it."

4

Plaintiff further testified that two weeks before the incident at the baseball field on September 16, 2019, defendant called her a "whore" and "cum dumpster" in the presence of their son. During that altercation, defendant threatened to send text messages that would "ruin [her] life." Plaintiff stated that she was afraid of defendant's malicious acts and his continuing attempts to control her life.

Plaintiff also said she had not been in contact with defendant for several weeks, but previously defendant had engaged in malicious acts every time she was in his presence. She admitted that, at times, she had called defendant "names." She also admitted that she waited twenty-four hours to file her complaint in this matter, and she never called 9-1-1 to report the September 16, 2019 incident.

Defendant testified that he did not call plaintiff a "whore" or "cum dumpster," and he denied telling plaintiff that he was going to ruin her life. Defendant admitted he and plaintiff had been "bickering back and forth" at the ballfield on September 16, 2019. He also admitted that he sent a text message to members of plaintiff's family. He said he did so because he thought they might be able to help him get plaintiff to return her cellphone to him. He

testified that he had been trying to get plaintiff to return the phone for eight months.

Defendant also acknowledged that he sent a text message to S.M. He stated that he wanted S.M. to help him get plaintiff to return the phone to him. He said it was his understanding that plaintiff was "in a relationship" with S.M.'s boyfriend, but he was not sure. He also admitted sending text messages to six other people, including plaintiff's mother, asking for their help in getting plaintiff to return the phone. Defendant said he had been paying for plaintiff's phone, and he could trade in her phone and get a phone for his son. He admitted, however, that he did not need another phone to communicate with his son.

The record also shows that the parties agreed to the entry of an order dated June 21, 2019, which dismissed the TRO entered under Docket No. FV-07-3467-19 and imposing civil restraints. Among other things, the June 21, 2019 order prohibited each party from having physical contact, verbal and written communication, or communication through a technical device, with each other, their family members, or employers. The order also restrained the parties from defaming, denigrating, and maligning each other.

After hearing closing arguments by counsel, the Family Part judge placed his decision on the record. The judge found that plaintiff was more credible

6

than defendant. The judge noted that defendant had been engaging in his own form of self-help in trying to obtain plaintiff's cellphone. The judge found that the parties argued over plaintiff's phone and defendant used foul language at the ballfield. Defendant also followed up by sending text messages to plaintiff's family members. The judge stated that this was a violation of the civil restraints in the June 21, 2019 order.

The judge found that defendant had engaged in harassment, in violation of N.J.S.A. 2C:33-4(a), which is a predicate act of domestic violence under the PDVA. The judge stated that defendant did not send the text messages to S.M. and plaintiff's family members solely to get plaintiff's phone back. The judge found defendant sent the text messages to these individuals with the intent to harass plaintiff.

The judge then considered whether an FRO should be issued. The judge considered the parties' history. This included the dispute in September 2018, which involved physical violence, damage to the computer, and the bruising of plaintiff's arm. Moreover, in May 2019, defendant went to plaintiff's home late in the evening and sent her a text message indicating he was "spy[ing]" on her. The judge found that defendant's actions had annoyed and alarmed plaintiff, and

7

an FRO was needed. The judge memorialized his decision in the FRO dated November 13, 2019. This appeal followed.

On appeal, defendant argues that the Family Part judge: (1) misapplied the harassment statute, N.J.S.A. 2C:33-4; and (2) failed to evaluate all of the factors in N.J.S.A. 2C:25-29(a) in determining whether an FRO was necessary to prevent immediate danger or further abuse.

II.

The scope of our review of a trial judge's findings of fact is strictly limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). The trial court's findings are "binding on appeal when supported by adequate, substantial, credible evidence." Id. at 411-12 (quoting Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974)). Our deference to the trial court's findings of fact is especially appropriate "when the evidence is largely testimonial and involves questions of credibility." Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).

Moreover, we accord deference to the factual findings of the Family Part's judges because that court has "special jurisdiction and expertise in family matters, . . ." Id. at 413. We note, however, that a trial judge's decision on a purely legal issue is subject to de novo review on appeal. Crespo v. Crespo, 395

N.J. Super. 190, 194 (App. Div. 2007) (citing <u>Manalapan Realty, L.P. v. Twp.</u> <u>Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995)).

On appeal, defendant argues that the trial judge misapplied the harassment statute in finding that he committed a predicate act of domestic violence under the PDVA. He contends the judge erred by finding him guilty of harassment under N.J.S.A. 2C:33-4 based on text messages to third parties. He contends there is no evidence that any of these text messages were directed at plaintiff.

The PDVA identifies certain acts of domestic violence, which include harassment under N.J.S.A. 2C:33-4. <u>See</u> N.J.S.A. 2C:25-19(a). N.J.S.A. 2C:33-4 provides that:

> [A] person commits a petty disorderly persons offense if, with purpose to harass another, he:
>
> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

Under N.J.S.A. 2C:33-4, subsection (a) criminalizes harassing communication while subsections (b) and (c) criminalize harassing conduct.

State v. Hoffman, 149 N.J. 564, 580 (1997).  Furthermore, subsections (a) and (b) of N.J.S.A. 2C:33-4 only require that the communication or conduct be a single act while subsection (c) requires a "course of conduct."  Ibid.

To find an individual guilty of harassment under  subsection (a), the court must find: "(1) defendant made or caused to be made a communication; (2) defendant's purpose in making or causing the communication to be made was to harass another person; and (3) the communication was in one of the specified manners or any other manner similarly likely to cause annoyance or alarm to its intended recipient."  Hoffman, 149 N.J. at 576.

In Hoffman, the Court explained that the first element targets harassing communications and only requires a single act for conviction.  Id. at 580.  The second element requires proof that the defendant acted "with purpose to harass the intended recipient of the communication."  Id. at 582.

In addition, the third element does not require serious annoyance, and the impact upon the victim does not have to be as severe as that required to sustain a conviction under subsection (c).  Id. at 581.  Furthermore, the phrase "any other manner" in N.J.S.A. 2C:33-4(a) only encompasses "those types of communications that also are invasive of the recipient's privacy."  Id. at 583.

A-1358-19T3

When determining whether a person has engaged in harassment under N.J.S.A. 2C:33-4(a), the trial court may "examine the totality of the circumstances, especially and including the context of domestic violence, in determining whether subsection (a) has been violated." Id. at 584. Finally, in deciding if the third element has been established, the court must consider whether the defendant's communication rose to the required level of annoyance or alarm, which takes into account the defendant's "past conduct toward the victim" and the parties' relationship history. Id. at 585.

We are convinced there is sufficient credible evidence in the record to support the trial court's determination that defendant engaged in harassment in violation of N.J.S.A. 2C:33-4(a). Here, defendant made communications to plaintiff "in offensively coarse language" and in a "manner likely to cause annoyance or alarm . . . ." Ibid.

As the record shows, defendant approached plaintiff at the ballfield, where the parties' son was practicing, to discuss a cellphone bill and an argument ensued. Plaintiff testified that defendant called her a "whore" and "cum dumpster," and said he was going to "fuck up her life." Plaintiff further testified that defendant sent messages to plaintiff's acquaintance S.M. and members of

11

plaintiff's family regarding the cellphone dispute. The judge found that plaintiff's testimony was credible.

Defendant's communications with plaintiff and her family members were a violation of the restraints imposed under the June 21, 2019 order. The communications also were an invasion upon plaintiff's privacy. The judge found that communications with plaintiff's family members were not solely to ask their help in retrieving the phone. The evidence supports the trial judge's conclusions that defendant engaged in these communications with a purpose to annoy or alarm plaintiff.

Defendant argues, however, that the judge erred by considering his communications with S.M. and plaintiff's family members in determining that he harassed plaintiff in violation of N.J.S.A. 2C:33-4(a). In support of that argument, defendant relies upon J.D. v. M.D.F., 207 N.J. 458 (2011).

In J.D., the Court held that N.J.S.A. 2C:33-4(a) requires proof that the plaintiff was "the target of the harassing intent." Id. at 486. The Court found that the defendant's "snide remarks" to the plaintiff's "new beau" when the plaintiff was not present "could not serve as evidence of an intent to annoy or alarm plaintiff." Ibid.

Here, however, the record supports the judge's determination that defendant's communications with S.M. and plaintiff's family members were intended to annoy plaintiff. The judge properly found that when considered in light of all the evidence, including the parties' history of domestic violence, the communications were directed at plaintiff and she was the target of his harassing conduct. Thus, defendant's reliance on J.D. is misplaced.

III.

Defendant also argues that the trial judge erred by failing to apply the constitutional principles enumerated in State v. Burkert, 231 N.J. 357 (2017). In that case, the Court held that the phrase "any other manner likely to cause annoyance or alarm" in N.J.S.A. 2C:33-4(a), only encompasses modes of communicative harassment that are (1) "invasive of the recipient's privacy" or (2) "constitute threats to safety." State v. Burkert, 231 N.J. 257, 278 (2017) (quoting Hoffman, 149 N.J. at 583).

When evaluating whether conduct constitutes harassment under N.J.S.A. 2C:33-4(a), the court "must consider the totality of the circumstances." Cesare, 154 N.J. at 404 (citing Hoffman, 149 N.J. at 584-85). Furthermore, when determining whether communications are invasive of the recipient's privacy, the court must take into consideration that "conduct that does not constitute an

invasion of privacy to the ordinary victim under subsection (a) might constitute harassment to the victim of past domestic abuse." Id. at 405 (citing Hoffman, 149 N.J. at 585).

Therefore, "defendant's past conduct toward the victim and the relationship's history must be taken into account." Ibid. In addition, as our Supreme Court has explained:

> [T]he decision about whether a particular series of events rises to the level of harassment or not is fact-sensitive. The smallest additional fact or the slightest alteration in context, particularly if based on a history between the parties, may move what otherwise would appear to be non-harassing conduct into the category of actions that qualify for issuance of a restraining order.
>
> [J.D., 207 N.J. at 484.]

In this case, the trial judge considered the totality of the circumstances in determining if defendant engaged in harassment in violation of N.J.S.A. 2C:33-4(a) and applied the statute in accord with Burkett. The judge noted that the parties had separated. They were in the process of divorcing but had ongoing contacts regarding their son. The judge also noted that plaintiff had twice sought TROs, and the parties had previously agreed to the entry of a consent order with civil restraints.

A-1358-19T3

The judge also considered defendant's conduct, which included the prior incidents that occurred in September 2018 and May 2019. As stated previously, during the first incident, the parties' argument became physical, and resulted in damage to the computer and bruises to plaintiff's arm. During the second incident, defendant sent plaintiff a message late in the evening indicating he was outside her apartment "spy[ing]" on her.

The incident at the ballfield on September 16, 2019, did not occur, as defendant claims, in a private place. Moreover, defendant's communications with plaintiff, S.M., and plaintiff's family members pertained to a dispute between the parties about plaintiff's cellphone. Defendant's communications with third parties about this matter was an invasion of her privacy. In addition, the judge found that plaintiff credibly testified that defendant stated he would "fuck up her life." Plaintiff reasonably viewed this as a threat to her safety.

Defendant further argues that the trial judge erred by finding he intended to harass plaintiff. He asserts that he may have made communications to disturb or bother plaintiff, but claims the communications were not intended to harass her. He contends his statements were an immediate expression of frustration, which were not made with an intent to harass. These contentions lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

15

IV.

Defendant also contends the trial judge erred by failing to evaluate all of the factors relevant to the issuance of an FRO in N.J.S.A. 2C:25-29(a)(1) to (6), as required by Silver v. Silver, 387 N.J. Super. 112, 126-27 (App. Div. 2006). Again, we disagree.

In deciding whether to issue an FRO pursuant to the PDVA, the trial judge must engage in a two-step inquiry. Silver, 387 N.J. Super. at 125. The judge must first determine whether the plaintiff has established by a preponderance of the evidence, that the defendant has committed one of the predicate acts set forth in N.J.S.A. 2C:25-19(a). Ibid. If the plaintiff has established that the defendant has committed a predicate act of domestic violence, the judge must then decide whether to issue an FRO. Id. at 127.

In some cases, "the risk of harm is so great" that the determination of whether a restraining order should be issued is "perfunctory and self-evident." J.D., 207 N.J. at 475-76, 488. Other cases, however, require an in-depth analysis to determine whether "relief is necessary to prevent further abuse." Id. at 476. In all cases, the critical inquiry under the second prong is determining "whether a domestic violence restraining order is necessary to protect the plaintiff from immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 128.

16

Here, the trial judge did not explicitly review all six factors set forth in N.J.S.A. 2C:25-29(a)(1) to (6). However, based on the evidence presented at the hearing, it is apparent that the most relevant factors are the history of domestic violence between the parties, the existence of "immediate danger" to a person or property, the "best interests of the victim and any child;" and "[t]he existence of a verifiable order of protection from another jurisdiction." N.J.S.A. 2C:25-29(a)(1), (2), (4), and (6).

The record shows the parties have a prior history of domestic violence, which includes physical abuse and property damage. Moreover, the judge found that plaintiff credibly testified that defendant threatened to "fuck up" her life and that defendant engaged in multiple acts of harassment through his communications with plaintiff's family members. The record shows there was an "immediate danger" of further acts of harassment, with a potential for violence.

Plaintiff testified that she feared defendant would engage in further "malicious acts." In addition, the evidence showed that defendant had violated the civil restraints in the court's June 21, 2019 order. The evidence thus shows that an FRO would be in plaintiff's best interest. Therefore, the record supports

17

the court's finding that an FRO was needed to protect plaintiff from further acts of domestic violence.

V.

Defendant further argues that by denying his request for an adjournment, the trial judge denied him sufficient time to prepare for the FRO hearing. He asserts the denial of his adjournment request denied him of his right to due process.

In J.D., the Court emphasized that "ordinary due process protections apply in the domestic violence context, notwithstanding the shortened time frames for conducting a final hearing…." 207 N.J. at 478. Although the process required depends on the case, "at a minimum, due process requires that a party in a judicial hearing receive notice defining the issues and an adequate opportunity to prepare and respond." Ibid (quoting H.E.S. v. J.C.S., 175 N.J. 309, 321 (2003)).

Here, defendant argues that his attorney only had twenty-four hours to prepare for the FRO hearing. The record shows defendant was personally served with a copy of the amended TRO on October 1, 2019. The amended TRO stated that the hearing was scheduled for November 15, 2019; however, the court rescheduled the matter for a hearing on November 13, 2019. Even so, defendant

A-1358-19T3

had ample time after being served with the amended TRO to retain counsel. Defendant has not shown that his ability to defend the matter was significantly and adversely affected by the judge's decision to deny his request for an adjournment.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1358-19T3